793 A.2d 731 (2002)
Elsie LASCURAIN, Plaintiff-Appellant,
v.
CITY OF NEWARK, Department of Welfare, Department of Development, Mayor Sharpe James, Marie E. Villani, Donald Tucker, Henry Martinez, and Anthony Carrino, Defendants-Respondents, and
Irving Klein and Bernard Klein, as directors and officers of Kingsland Drum and Barrel, and Kingsland Drum and Barrel, Defendants-Respondents/ Third-Party Plaintiffs, and
Rosemary Hacking, Director of Newark Development, Irving Klein, Bernard Klein, Individually, Allied Equipment Corp. and Advanced Recycling Corp., Jesse Allen, Milton Buck, and Kenneth Gibson, Defendants,
v.
United New Jersey Railroad and Canal Company/Pennsylvania Railroad, Defendant/Third-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued January 22, 2002.
Decided March 12, 2002.
*736 David M. Freeman, Livingston, argued the cause for appellant (Nagel, Rice, Dreifuss & Mazie, attorneys; Mr. Freeman, of counsel, Anthony J. Monaco, on the brief).
Hugh Gallagher, Newark, argued the cause for respondents, City of Newark, Mayor Sharpe James, Marie E. Villani, Donald Tucker, Henry Martinez, and Anthony Carrino (Joanne Y. Watson, Corporation Counsel, attorney; Hugh Gallagher, Assistant Corporation Counsel, on the brief).
Richard P. Flaum, argued the cause for respondent, Kingsland Drum and Barrel (Bateman, Coley, Yospin, Kunzman, Davis & Lehrer, attorneys; Mr. Flaum, on the brief).
Before Judges KESTIN, STEINBERG and ALLEY. *732 *733 *734
*735 The opinion of the court was delivered by ALLEY, J.A.D.
Plaintiff appeals from summary judgment orders of a Law Division judge in Essex County dismissing her complaint against the City of Newark as the owner of certain cemetery property described below, various officials of the City, and defendant Kingsland Drum and Barrel with respect to their alleged liabilities for failure to properly maintain the grave of her father in a cemetery in Newark. Other parties to the action have been dismissed as defendants and this appeal does not involve them. The orders appealed from are final because, ultimately, all of plaintiff's claims against all remaining parties were disposed of. We affirm.

I
Plaintiff was born in 1914. She was placed in foster care by her father, together with her brother and sister, at an early age, her mother having died when she was one. In 1921, when she was seven, her father, who had remarried, was murdered by his new wife. He was buried in the cemetery in 1921. It was then known as City Cemetery but was also referred to as Potter's Field, a burial ground for indigent persons. Plaintiff learned of her father's death from a newspaper but was never told where he was buried.
Plaintiff left school after ninth grade, subsequently married and worked in a factory. She and her sister, now deceased, as is her brother, tried for years to locate their father's grave. In the 1960s they visited the Hall of Records and other offices in Newark, in search of details. These efforts were unsuccessful. Plaintiff's sister also hired a detective to locate their father's grave, but the detective provided no information.
Ultimately, plaintiff determined through the efforts of her daughter Anna, an attorney, which are detailed below, that her father's body had been buried in City Cemetery in Newark. She alleges that the graves in the cemetery suffered neglect and misuse and that the City and others caused portions of the cemetery to be covered by trash and to be subjected to other forms of disrespect and neglect.
The history of the cemetery and its antecedents can be summarized as follows:
In 1869, the City purchased fifteen acres in the southern part of Newark which became known as City Cemetery, and in the 1940's as Floral Rest. In present-day Newark, City Cemetery comprises about 5.2 acres and is located south of Haynes Avenue, bounded on the west by an unnamed public road and on the east by Bessemer Street. It is behind the Anheuser-Busch plant on Routes 1 and 9 and under the Haynes Avenue bridge.
*737 In 1903, and on an unknown date prior to that, the City sold two pieces of the cemetery property to United Jersey Railroad and Canal Company/Pennsylvania Railroad (Railroad). The sale in 1903, involved 10.23 acres at the western-most portion of the land, leaving 5.2 acres available for burial purposes. There are no records indicating that persons buried within the 10.23 acres were disinterred prior to or after the 1903 transaction but, as noted, plaintiff's father did not die until 1921.
City Cemetery was an active cemetery between 1869 and 1954. A cemetery superintendent was employed by the City, and some superintendents kept records of burials at the cemetery. Records indicate that the superintendent who was employed in that position from 1925 to 1939, Thomas H. Fairchild, kept a detailed ledger. In 1930, Owen A. Malady was appointed Overseer of the Poor within the Department of Welfare and was responsible for interring the City's indigent dead at the cemetery. During his tenure, Malady reportedly instituted a modern record system. In 1943, the City Cemetery's name was changed to Floral Rest. In 1949, the Spatola Funeral Home became responsible for burying all indigents for the City. The Spatola Funeral Home buried decedents in City Cemetery from 1949 to 1954 and maintained burial records for that time.
A newspaper article dating from approximately 1950 reported that conditions were poor at the City Cemetery. The article stated that human bones were strewn about the site and that some burial posts were marked with numbers but that most were not marked. In 1954, the City closed the cemetery. A preliminary assessment report of the site by an engineering firm estimated that by 1954, there had been approximately 20,200 burials within the 5.2 acres.
In 1958, Kingsland purchased land from the Railroad, located south of Haynes Avenue, east of an unnamed public road and west of Bessemer Street. At that time, Kingsland was aware that City Cemetery was east of the unnamed public road, but was unaware that a portion of the land it purchased from the railroad may have been part of City Cemetery. At the time of the purchase, City Cemetery was surrounded by hedges, separating it from the land purchased by Kingsland. Sometime between 1958 and 1975, the portion of City Cemetery directly adjacent to and east of the unnamed public road was paved over with asphalt.
In 1962, the City paid Kingsland $12,500 for an easement across Kingsland's property, in order to begin construction on the South Side Interceptor Sewer Project (the project). The project provided for the construction of sanitary sewer land pumping stations. The City began construction on the project in 1966, including the installation of sewer lines from the back of the Anheuser Busch brewery to the Passaic Valley Sewerage Plant. The project involved excavation and digging on the easement, in the course of which workers discovered skulls and various human bones. As a result, work on the project was closed for the night, but then it was resumed. Although not included in the parties' appendices, apparently the Newark Star-Ledger reported on the discovery of the skulls found by the workers in 1967.
On April 15, 1975, Kingsland entered into a lease with the City for .58 acres of property contained within City Cemetery. The leased property was directly adjacent to and east of the unnamed public road dividing Kingsland's property from City Cemetery, and was covered by asphalt. The lease between Kingsland and the City for this paved property was drafted on a pre-printed standard form, except for four *738 additional paragraphs, one of which, paragraph thirty, stated:
In the event that the landlord is hereafter required to exhume any graves located upon the leased premises, then and at the option of the Tenant, the lease may be terminated or in the alternative, the tenant may permit the Landlord to come upon the demised premises for the purposes of exhumation and reinterment and the Tenant shall bear all costs in connection with such exhumation and reinterment.
The Municipal Council of the City duly authorized the City's lease of the property. The July 16, 1975 resolution authorizing the execution of the lease identified the property as ".58 acres of Potter's Field." The Council members who voted in favor of the resolution were: Allen, Bottone, Guiliano, James, Martinez, Tucker, Villani and President Harris. The resolution indicated that the lease had been approved as to form and legality by the City's corporation counsel. Previously, on June 18, 1975, the Council had approved a resolution authorizing the lease of the property and the publication of the City's offer to lease, and on July 11 and July 14, 1975, the City had published a legal notice in the Newark-Star Ledger, soliciting "bids for offer to lease city-owned property, block 5090/lot 5,.58 acres of Potter's Field from the City of Newark."
In March 1980, a City official contacted Spatola Funeral Home for information about the date of the last burial at City Cemetery. The official explained that Newark was studying the feasibility of reinterment in order to convert the property to industrial use. That same month, the City's corporation counsel sent a memo to John Bugg, real estate officer, directing Bugg to take Block 5090/Lot 5 "out of the auction." The memo stated that corporation counsel had "not been able to verify that all the bodies have been removed. We cannot sell the property till we remove them."
From 1975 to 1990, Kingsland used the leased property as additional parking space. When Kingsland vacated the premises in 1990, there was no debris, trash or other storage material on the leased property. Irving Klein, an owner of Kingsland, observed in 1992 that that property was being used to store curbstones, salt piles, old street cleaning vehicles, and tires and in 1997 that a substantial amount of sand and dirt had been dumped on Kingsland's property. Kingsland's attorneys requested through the City's corporation counsel that the City cease and desist dumping debris on Kingsland's property. The City complied and removed the dirt and debris. Subsequently, dirt, debris, tires and garbage were again dumped on Kingsland's property.
In 1997, plaintiff asked her daughter Anna, an attorney, "to do some family research." After plaintiff furnished some information about her father, Anna obtained a copy of his death certificate from the Department of Health, which indicated that he was buried in City Cemetery. She also contacted several Newark agencies, including the Department of Welfare and the Department of Development, to determine where City Cemetery was located, but none of the departments had any maps or burial records prior to 1977.
Anna then reviewed a number of newspaper articles and old tax maps at the library, and was able to locate and visit the City Cemetery. At the time of her visit, a portion of the area was covered by asphalt and the property was filled with debris and garbage, although there were trucks moving dirt around. There were no grave markers or headstones.
Anna told plaintiff the results of her search, and plaintiff insisted on visiting the *739 City Cemetery. In October or November of 1997, Anna and plaintiff went to the site where plaintiff was shocked at "all the dirt and the barrels and the rubbish." Plaintiff became very upset, "kind of hysterical," and became nauseous after the visit. Following plaintiff's visit, she had nightmares, was depressed and "very upset" because "I have images of my father in the garbage dump." Plaintiff's personal physician, Dr. Weinstock, observed her depression on several occasions. He opined that "the situation regarding her father's grave is having an adverse effect on her blood sugar and heart condition and is, at least in part, and possibly primarily, the cause of her depression."
Plaintiff asked Anna to learn whether her father's remains had been moved from the City Cemetery. Anna wrote to the Newark mayor's office, which directed her letter to the corporation counsel, which provided no information. At that time, Anna also informed the corporation counsel that she and plaintiff had formed a Friends and Family of Potter's Field Task Force and were willing to assist Newark in the cleaning of the site and the indexing and retrieval of burial records.
Anna next called the Department of Welfare, which eventually referred her to Glenn Grant of the Newark business manager's office. Grant informed Anna that the bodies had never been moved from the City Cemetery, that he would try to locate records, and would contact Anna in July 1998. Anna called Grant in July 1998 and learned that he was no longer employed at the business manager's office. She then ascertained from the Newark Historical Society, however, that the City intended to clear City Cemetery of all debris, in anticipation of a sale of the property at auction. Upon discovery of this information, plaintiff decided to bring this suit.
After proceedings that are unnecessary to detail here, the Law Division disposed of plaintiff's claims against all parties other than Kingsland, Klein, and the City and its officials, who then moved for summary judgment on the remaining claims. On May 12, 2000, the Law Division Judge granted Kingsland's motion and also granted the City's motion in part, dismissing plaintiff's claims against James, Villani, Tucker, Martinez and Carrino.
On October 20, 2000, the judge granted summary judgment to the City with respect to the remaining claims against it. With respect to Klein the trial judge also dismissed plaintiff's claims, but that aspect of the trial court's disposition is not the subject of this appeal. These latter orders disposed of all claims against all remaining parties.
Plaintiff claims that the trial court erred in: (1) failing to address her claim that defendants violated her due process rights; (2) failing to address her claims of statutory violations; (3) dismissing her claims of intentional and negligent infliction of emotional distress; (4) concluding that the individual City Council members were entitled to statutory immunity; and (4) failing to appreciate the public policy significance of plaintiff's complaint.

II
We first address plaintiff's contentions that the trial court erred in dismissing all of her claims against the City. In particular, we consider her assertion that the trial court failed to consider her due process and statutory claims, and that it erroneously decided her emotional distress claim.
Because this case comes before us on an appeal from a grant of summary judgment, we consider whether, reviewing the evidence in the light most favorable to the non-moving party, there was any issue of material fact, and whether the City was *740 entitled to prevail as a matter of law. Brill v. Guardian Life Ins. Co., 142 N.J. 520, 530, 666 A.2d 146 (1995); Prudential Prop. Ins. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.1998).
We note initially that plaintiff is correct in asserting that the trial court appeared to determine, after dismissing plaintiff's claims against the individual City Council members on May 12, 2000, that her remaining claims against the City were limited to emotional distress. The trial court stated at the October 20, 2000 hearing that "the narrow issue here before me in the Law Division is whether or not there is a cause of action under the laws in the State of New Jersey for emotional distress under these circumstances."
Plaintiff's complaint alleged the following claims against the City:
(1) violation of N.J.S.A. 40:60-41, which requires the governing body of any municipality to provide for the removal of human remains if the municipality desires to devote the land for other purposes (count I);
(2) violation of N.J.S.A. 26:6-34, which requires persons in charge of burial grounds to maintain burial records (count II);
(3) violation of N.J.S.A. 8A:8-3, which requires the directors of any cemetery-owning lands to obtain the consent of interment space owners or a court order prior to the sale of such land (count III);
(4) violation of plaintiff's due process rights under the New Jersey Constitution and the Fourteenth Amendment of the United States Constitution (count IV);
(5) negligent, willful and intentional destruction of human remains, amounting to extreme outrage (count VIII);
(6) desecration of tombstone and graves (counts XXII-XXIX); and,
(7) negligent infliction of emotional distress (counts XXX-XXXVII).
Because plaintiff is correct in asserting that the trial court did not consider her claims other than for emotional distress, we will consider whether plaintiff's other claims against the City can proceed as a matter of law, those claims being, collectively: (a) denial of due process; and (b) violation of specific State burial and cemetery statutes. We then will address plaintiff's claims that the City committed grave desecration and the torts of intentional and negligent infliction of emotional distress.
A. The Denial of Due Process Claims
Plaintiff contends that the City denied her federal and state procedural due process rights to notice and a hearing because she has a property right in the remains of her father.
The Fourteenth Amendment of the United States Constitution provides that no state shall deprive any person of property without due process of law. U.S. Const., amend. XIV, § 1. See also, N.J. Const., Art. 1, ¶ 1, which does not enumerate the right to due process but protects "values like those encompassed by the principle[ ] of due process." Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1985).
In determining the existence of a property interest for federal due process purposes we look to state law. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 560 (1972). Moreover, in reviewing either a federal or state due process claim, we must "first assess whether a liberty or property interest has been interfered with by the State, and second, whether the procedures attendant upon that deprivation are constitutionally sufficient." Doe v. Poritz, 142 N.J. 1, 99, 662 A.2d 367 (1995).
*741 Plaintiff maintains that New Jersey recognizes property rights of next of kin in the remains of their deceased, relying on Spiegel v. Evergreen Cemetery Co., 117 N.J.L. 90, 93, 186 A. 585 (Sup.Ct.1936), where the court stated, "the right to bury the dead and preserve the remains is a quasi right in property, the infringement of which may be redressed by an action in damages." There, the children of the deceased were held entitled to recover damages from the cemetery company for burying their father in their absence, in violation of an agreement between the company and the family that the burial should take place only in their presence. Id. at 92, 186 A. 585.[1]
Only two New Jersey cases have cited Spiegel for its holding that a person has a quasi property right in a dead person's remains, Strachan v. John F. Kennedy Mem. Hosp., 109 N.J. 523, 538 A.2d 346 (1988) and Sherman v. Sherman, 330 N.J.Super. 638, 750 A.2d 229 (Ch.Div.1999). In Strachan, the New Jersey Supreme Court reinstated a jury verdict in favor of the parents of a suicide victim, who had sued the hospital for its negligent handling of their son's body by failing to promptly honor their wishes to turn off his life support system. Strachan, supra, 109 N.J. at 533, 538 A.2d 346. The Court cited Spiegel and noted that "[f]or more than half a century this state has recognized a quasi property right in the body of a dead person." Id. at 531, 538 A.2d 346. The Court further commented on the nature of this property right:
We pause to record our agreement with a commentator's observation about the "somewhat dubious nature" of a property right to the body[.] "It seems reasonably obvious that such `property' is something evolved out of thin air to meet the occasion, and that in reality the personal feelings of the survivors are being protected, under a fiction likely to deceive no one but a lawyer."
[Ibid. (quoting W.P. Keeton, D. Robbs, R. Keeton & D. Owens, Prosser & Keeton on Torts § 12 at 63 (5th ed.1984)).]
The Court then concluded that the "problem" of defining the specifics of such a property right could be avoided by "recognizing the obvious: the tort contemplates the wrongful infliction of mental distress." Id. at 531, 538 A.2d 346.
In Sherman, supra, 330 N.J.Super. at 642, 750 A.2d 229, the court dealt with whether a temporary injunction should be issued to prevent the decedent's widow from burying him.[2] In ruling on the motion, the court briefly discussed the nature of a family's property interest in a dead person, noting that "[r]ights in a dead body exist ordinarily only for purposes of burial and, except with statutory authorization, for no other purpose." Id. at 648 n. *742 10, 750 A.2d 229. The court then cited Spiegel and Strachan for the principle that a quasi property right exists in the dead but noted that the New Jersey Supreme Court in Strachan had done so "somewhat uncomfortably." Ibid. Given that the Strachan Court had noted that this property right was "somewhat dubious," the court in Sherman concluded that "the extent of the quasi property rights which a dead body create remains uncertain." Ibid.
We consider Strachan, Spiegel, and Sherman to mean that any property right that plaintiff had in her father's remains was limited to the right of burial or other lawful disposition. Spiegel and Sherman concerned a family's right to the body of the deceased, for purposes of burial. Strachan involved a family's right to recover damages for emotional distress for the hospital's wrongful retention of a dead body and interference with the family's right to bury their son. We do not understand those cases to suggest that the quasi property right goes beyond burial and memorialization. Spiegel expressly held "that the right to bury the dead and preserve the remains is a quasi right in property...." Spiegel, supra, 117 N.J.L. at 93, 186 A. 585. Indeed, language in Strachan indicates that the so-called property right is merely another way of saying that the family of a deceased may bring an action for emotional distress. Strachan, supra, 109 N.J. at 531, 538 A.2d 346. It is evident that decades after her father's burial, plaintiff no longer has an entitlement to his remains. In short, plaintiff has no property interest in her father's body.
The restricted nature of a family's property right is further illustrated by the principle that a family does not have any right to a deceased's body after burial. "[O]nce a body is buried it is in the custody of the law, and removal or other disturbance of it is within the jurisdiction of our courts with equitable powers." Sheffield v. McDonough, 22 N.J. 548, 556, 126 A.2d 886 (1956); see also Harris v. Borough of Fair Haven, 317 N.J.Super. 226, 234, 721 A.2d 758 (Ch.Div.1998) (stating that Superior Court possesses equitable jurisdiction over the dead). N.J.S.A. 26:6-37 codifies this rule, stating that "[n]o dead body shall be disinterred or removed from any grave, tomb or burial place within this State except by direction of a competent court of this State[.]"
The Restatement (Second) of Torts also supports the limited property right of a family to a dead body. Section 868 provides for a cause of action for interference with a dead body, against one who "intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation...." Restatement (Second) of Torts § 868 (1977).[3]
In sum, plaintiff's claim that she was deprived of property in violation of *743 due process on both state and federal grounds fails because she no longer has a constitutionally protected property interest in her father's remains.[4] Any interest she had in her father's body was limited to that of ensuring that the integrity of his corpse was preserved in preparation for his burial and securing a proper burial or other form of authorized disposition of his remains. Indeed, under New Jersey law, once a body has been buried, the next of kin have no property rights, and custody over the body vests in the Superior Court. Since it is now decades after the death of plaintiff's father and his burial in City Cemetery, plaintiff had no protected property interest in her father's body of which she could be unconstitutionally deprived.
B. Plaintiff's Statutory Claims
Plaintiff's claims arising from alleged statutory violations focus on three specific statutory sections: N.J.S.A. 40:60-41; N.J.S.A. 26:6-34; and N.J.S.A. 8A:8-3.
N.J.S.A. 40:60-41 allows the governing body of any municipality in which a burial ground is located to devote such lands to any other public purpose, provided that the governing body does so by ordinance and the ordinance provides for the removal of any human remains to a proper burial place and suitable marking and care of the moved remains.[5]
Arguably the City has used the land for a public purpose other than burial in a number of ways: (1) by allowing a sewer pipe to be run through the cemetery; (2) by leasing a portion of the property to Kingsland and thereby allowing the cemetery to be used for commercial purposes; (3) by paving over a portion of the cemetery; and (4) by allowing the storage of debris, tires and garbage in the cemetery, at least since 1966 and continuing to the date of plaintiff's filing of this action. We have been cited to no evidence that the City adopted any ordinance or resolution providing for the removal of any bodies.
Under N.J.S.A. 26:6-34, the "person in charge of any premises on which an interment is made" must "keep a permanent record of any burial or other disposal made on such premises ...." The record "shall in each case state the name of the deceased person, place of death, date of burial or other disposal, and the name and address of the funeral director." The counterpart to this statute that was in effect in 1921 was L. 1920, c. 99, § 21.
With respect to this statute, the City evidently failed to keep adequate records of burials made in City Cemetery. The City was unable to tell plaintiff where her father was buried. She was only able to obtain this information after contacting the State Department of Health. Indeed, it appears that the City has no burial records prior to 1977. Arguably then, the City violated this record keeping obligation in *744 1921 when plaintiff's father was buried in the cemetery.
N.J.S.A. 8A:8-3, part of the New Jersey Cemetery Act (N.J.S.A. 8A:1-1 to 11-1), allows the "directors of any cemetery owning lands in which burials have been made" to remove the bodies and sell such lands, provided that the corporation shall either obtain the written consent of the owner of the interment space or apply to the Superior Court for an order for the sale of the land, which order will require publication in a designated newspaper of the intended sale.
Plaintiff's grounds for this claim are questionable, because she asserts that the City violated N.J.S.A. 8A:8-3 by developing the cemetery and turning it into a garbage dump. Plaintiff does not allege that the City sold the land. Therefore, under the facts alleged by plaintiff, she has no claim because there has been no sale. The historical record shows, however, that the City sold some of the land on which the cemetery was located in the early 1900s, including the sale in 1903 to the Railroad. Under the counterpart to N.J.S.A. 8A:8-3 that existed at that time, L. 1895, c. 361, §§ 1, 2, the City arguably also violated the statute with that sale.
One obstacle to claims based on these alleged statutory violations, however, is that the majority of the City's violations occurred in the distant past. None of the relevant statutes include a time limitation after which actions may no longer be brought, but there is no basis for holding the City accountable for most of its statutory infractions, because they occurred more than fifty years ago. The longest limitations period for civil claims in this State is twenty years. See N.J.S.A. 2A:14-7 (providing twenty year statute of limitations for actions at law for real estate). Thus, we view this statute-based claim as untimely. Even the City's ongoing use of the cemetery as a dumping and storage ground in the 1990s, which only stopped when plaintiff filed this action, would not suffice to sustain plaintiff's claim, however, because plaintiff has no private right to bring an action to enforce N.J.S.A. 40:60-41. The statute omits any mention of how to enforce a violation of any statutory provision, or what penalties or fines may be recovered for any such violation.[6]
Another obstacle to these claims is that two statutes cited by plaintiff expressly identify those who may bring an action and do not authorize a private party to do so. For example, N.J.S.A. 8A:8-3 limits any enforcement actions to the New Jersey Cemetery Board. The penalties section of the New Jersey Cemetery Act, N.J.S.A. 8A:10-1, enumerates the amount of the penalty that any person violating any provisions of the act shall pay to the Cemetery Board. Subsection (b) further requires that any action seeking payment of a penalty "shall be sued for, recovered by and in the name of the New Jersey Cemetery Board."[7]
*745 In addition, N.J.S.A. 8A:10-2 provides that any penalty imposed because of the violation of any provision of the New Jersey Cemetery Act shall be collected and enforced by summary proceedings in a civil action and that process shall issue at the suit of the New Jersey Cemetery Board.
We are persuaded that under the New Jersey Cemetery Act, only the New Jersey Cemetery Board has the right to bring any actions to enforce the act and that plaintiff has no standing in law to assert in a civil action that the City has violated the New Jersey Cemetery Act. We reach the same conclusion as to Title Twenty-Six, which has a similar limitation, and requires that any actions to recover penalties be brought in the name of the State Department or local board. N.J.S.A. 26:6-49. The statutory scheme requires a person such as plaintiff to lodge her complaint with the appropriate administrative authorities.
In sum, plaintiff's claims of statutory violations cannot go forward as a matter of law because: (1) the violations are time-barred, and (2) even where the violation occurred more recently, plaintiff has no private right to enforce the statute.
C. The Tort Claims of Grave Desecration and Infliction of Emotional Distress
Plaintiff contends that the trial court wrongly dismissed her tort claims of tombstone and grave desecration and infliction of emotional distress on the ground that the events giving rise to plaintiff's distress occurred "too long ago." Plaintiff's complaint essentially alleged three claims of emotional distress against the City: (1) negligent, willful and intentional destruction of human remains, amounting to extreme outrage (count VIII); (2) desecration of tombstone and grave (counts XXII-XXIX); and (3) negligent infliction of emotional distress (counts XXX-XXXVII). We conclude that plaintiff's claims of emotional distress are legally insufficient, but we do so on different grounds than the trial court and disagree with the trial court's implicit conclusion that plaintiff had not satisfied the requirements for a "bystander" to make a claim for emotional distress. In this connection, we note that, as Judge Petrella stated in Ellison v. Evergreen Cemetery, 266 N.J.Super. 74, 78, 628 A.2d 793 (App.Div.1993), in general "an order or judgment will be affirmed on appeal if it is correct, even though the judge gave the wrong reasons for it." See also Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199, 773 A.2d 706 (2001); Medford v. Duggan, 323 N.J.Super. 127, 138, 732 A.2d 533 (App.Div.1999).
Preliminarily, we observe that New Jersey has not recognized an independent tort of tombstone and grave desecration. Plaintiff acknowledges that New Jersey "lacks a reported decision analyzing [cemetery desecration] as a predicate for an emotional distress claim."
Notwithstanding the lack of case law in this State on whether grave desecration is a compensable tort, in our view a claim involving the disturbance of a grave would be cognizable under a theory of emotional distress, especially given our Supreme Court's discussion in Strachan, supra, 109 N.J. at 531, 538 A.2d 346, that a family's claim over the handling of a dead body "obviously" contemplated the "wrongful infliction of mental distress." In view of Strachan's determination that a family may recover for the emotional distress resulting from the mishandling of a corpse, we believe a family also would have a claim resulting from the mishandling or misuse of a burial plot. Such a conclusion would not create a new tort in this State but would merely require a plaintiff to *746 meet the requirements of a claim for emotional distress. See, e.g., Prosser & Keeton on Torts, supra, § 54 at 362; Danny R. Veilleux, Annotation, "Liability for Desecration of Graves and Tombstones," 77 A.L.R. 4th 108 at § 2 (1989).
As we understand the trial court's ruling, it dismissed plaintiff's claim of infliction of emotional distress because it concluded that (1) plaintiff had failed to establish an observational basis for her claim of causation; and (2) too much time had elapsed. With respect to causation, the trial court first noted its concern with the need to establish "some nexus between the actual physical seeing of something or impression, and what we've got here, and it's a tragedy with the circumstances ... but nobody's even really sure exactly which cemetery, which spot." The court then repeated the necessity of showing an observational basis for causation:
give me something that shows an actual nexus between something that she physically saw; not just something she learned. Because I think something she learned, we even know that with the cases now, with the horrible injuries of what parents see about children, not what they learned when they arrive at the hospital. They have to have seen it.[8]
Plaintiff asserts three emotional distress claims, which in our view can be more properly categorized as two claims. One of the three, the tort of outrage, is in essence the claim of intentional infliction of emotional distress; plaintiff's two other allegations of emotional distress are based on negligence. Consequently, we will next consider the requirements of the torts of intentional and negligent infliction of emotional distress.
In order to sustain a claim alleging outrage, or the intentional infliction of emotional distress, a plaintiff must first prove that the defendant acted intentionally or recklessly. Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988). A defendant acts recklessly when he or she acts in deliberate disregard of a high degree of probability that emotional distress will follow. Ibid. Second, the defendant's conduct must be extreme or outrageous, meaning it must "go beyond all possible bounds of decency[.]" Ibid. Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress. Ibid. Fourth, the emotional distress suffered must be "so severe that no reasonable man could be expected to endure it." Ibid. Physical injury need not be proven; it is sufficient if the plaintiff suffers severe emotional distress. Id. at 367, 544 A.2d 857.
A claim of direct, negligent infliction of emotional distress requires a plaintiff to show that the defendant had a duty, the defendant owed the duty toward the plaintiff, and that the defendant breached that duty, proximately causing the plaintiff's injury of genuine and substantial *747 emotional distress. Decker v. Princeton Packet, Inc., 116 N.J. 418, 429-30, 561 A.2d 1122 (1989); Lacy v. Cooper Hosp./ University Med. Ctr., 745 F.Supp. 1029, 1035 (D.N.J.1990). Whether the defendant has a duty of care to the plaintiff depends on whether it was foreseeable that the plaintiff would be seriously, mentally distressed. Decker, supra, 116 N.J. at 429, 561 A.2d 1122 (1989).
It appears that the trial court applied bystander liability law to plaintiff's claim. This was error. Plaintiff's claim is based on a breach of a duty owed directly to her by the City. In a bystander case, a plaintiff's theory of recovery is predicated on his or her status as a witness to a horrific event. Such a claim must satisfy four elements: (1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress. Portee v. Jaffee, 84 N.J. 88, 101, 417 A.2d 521 (1980).[9]
The trial court in this case focused on plaintiff's failure to "actually see something" and her inability to establish "some nexus between the actual physical seeing of something or impression." In our view, plaintiff's claim is a direct claim of emotional distress because her allegations do not involve any injury to another. Like the parents in Strachan, supra, 109 N.J. at 535, 538 A.2d 346, plaintiff's emotional distress claim "was not the result of witnessing another's injury but rather the result of a breach of duty owed directly to plaintiff[ ]." And, like the brain-dead son in Strachan, plaintiff's father was also deceased, and therefore could suffer no cognizable harm as a result of the City's negligence or willful misconduct. Instead plaintiff's distress was related directly to the City's management and handling of City Cemetery. Ibid. (describing a duty owed to plaintiffs by hospital related to handling of deceased son's body).
The relevant inquiry respecting plaintiff's claim of negligent infliction of emotional distress is whether the City had a duty to plaintiff and whether the City breached that duty, proximately causing plaintiff's emotional distress. We conclude that the City owed a duty to plaintiff because it was foreseeable that surviving relatives would visit their deceased relatives at the cemetery and suffer emotional distress upon seeing that the cemetery had been turned into a dumping and storage ground. The record indicates that in 1980, the City knew that bodies were still interred in the cemetery, and there is no evidence indicating that the City's knowledge of this circumstance changed after 1980. Therefore, as long as the City knew that City Cemetery still existed as a burial ground, it had a duty to surviving relatives to maintain the grounds as a cemetery or, complying with N.J.S.A. 40:60-51.8, to move the remains to a more suitable place.[10]
*748 Even though the City has breached such a duty to plaintiff, however, her claim cannot go forward as a matter of law because she has not suffered compensable emotional distress. "The severity of the emotional distress raises both questions of law and fact. Thus, the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." Buckley, supra, 111 N.J. at 367, 544 A.2d 857.
In Buckley, the Supreme Court concluded that the plaintiff had provided insufficient evidence of mental distress, where he stated that he had lost sleep, was aggravated, developed headaches and suffered nervous tension. Id. at 368, 544 A.2d 857. Thus, the Court affirmed the trial judge's grant of summary judgment to the defendant.[11] Here, plaintiff's facts in support of her claim of emotional distress are that: (1) she became nauseous and very upset on the day of her visit to the cemetery and "kind of hysterical;" (2) following the visit, she became depressed and has had nightmares; and (3) she no longer enjoys her activities the way she used to. Her personal physician, Dr. Weinstein, also corroborated her depression. At her deposition, however, plaintiff revealed that she still plays bingo, belongs to a friendship club and tries to keep herself busy. She stated: "I keep myself pretty active. I go up Main Street once in a while. I treat myself, get my hair done, treat myself to a dinner." She also responded "yes" in response to the question of whether she was doing the "same sort of things now" as before the visit to the cemetery.[12]
Although plaintiff understandably has suffered emotionally from the City's neglect of the cemetery, her distress has not risen to the required threshold level to support an emotional distress tort claim. There has not been the type of dramatic impact on her every-day activities or on her ability to function daily that is required as a general rule. See Buckley, supra, 111 N.J. at 369, 544 A.2d 857 (noting that Buckley could not recover, in part, because he did not claim any interference with his everyday routine). Nor has plaintiff sought regular psychiatric counseling. Equally important, plaintiff has made no showing that she has satisfied the threshold of the Tort Claims Act. See generally Brooks v. Odom, 150 N.J. 395, 696 A.2d 619 (1997).
With respect to plaintiff's emotional distress claim under the Tort Claims Act, we note that N.J.S.A. 59:9-2 bars recovery for pain and suffering, absent evidence of "loss of permanent bodily function." Ordinarily, a plaintiff cannot recover damages for emotional distress *749 alone from a state entity or employee. See Ayers v. Jackson Township, 106 N.J. 557, 576, 525 A.2d 287 (1987) (barring residents' damage claims for emotional distress against municipality that had contaminated water wells because their symptoms of depression and anxiety constituted pain and suffering under statute); Collins v. Union County Jail, 150 N.J. 407, 413, 696 A.2d 625 (1997) (allowing recovery of emotional distress damages against public entity because in severe, violent attack sodomized prisoner had suffered direct, violent and physical assault). Moreover, under the statute as in effect when suit was filed, plaintiff must allege medical expenses in excess of $1000. N.J.S.A. 59:9-2(d). We have been pointed to no evidence in this matter, however, that plaintiff has sustained medical expenses in excess of $1000. In short, plaintiff's emotional distress, while no doubt genuine, is insufficient as a matter of law to sustain her general tort claim or her specific claim for relief under the Tort Claims Act.
For the same reason, plaintiff's claim of intentional infliction of emotional distress also fails. As we have shown earlier, a claim of intentional infliction of emotional distress requires a plaintiff to show that the defendant acted intentionally or recklessly, proximately causing a plaintiff's emotional distress. Arguably, the record evidences the City's reckless conduct. Since the City knew in 1980 that the cemetery still contained bodies, and there is no information indicating that this knowledge changed in any way after 1980, the City's continued use of the cemetery as a storage facility and dumping ground from 1980 onward could be construed as reckless conduct, going beyond all bounds of decency, especially given the special status of cemeteries in our society. See, e.g., Locustwood Cem. Ass'n v. Cherry Hill Tp., 133 N.J.Super. 92, 95, 335 A.2d 571 (App.Div.1975) (cemeteries constitute special real estate since they facilitate the proper and necessary disposition of human remains).
Just as is true regarding her claim of negligent infliction of emotional distress, however, plaintiff's intentional infliction claim also cannot go forward because the record does not show that plaintiff's emotional distress, though genuine, is sufficiently substantial to justify putting the issue before a jury. Therefore, since both negligent and intentional infliction claims require the same level of emotional distress, if plaintiff's negligent infliction claim is insufficient, then her claim of intentional infliction is similarly precluded.
To summarize, while the trial court incorrectly analyzed plaintiff's claim of negligent infliction of emotional distress under the principles of bystander liability, its conclusion that plaintiff had no emotional distress claims, either negligent or intentional, as a matter of law, was correct for other reasons. Plaintiff's claims cannot go forward because she has failed to demonstrate that she has suffered severe and substantial emotional distress. For that reason, plaintiff's claims of emotional distress are insufficient as a matter of law to satisfy either general tort requirements or the requirements of the Tort Claims Act.

III
We next examine plaintiff's assertion that the trial court wrongly dismissed her claim of intentional infliction of emotional distress against Kingsland and failed to address her claim of constitutional denial of due process against Kingsland. She is correct that the trial court did not address her due process claim against Kingsland, but that omission does not require reversal of the summary judgment order in favor of Kingsland because that claim is without merit. Moreover, while the trial court was *750 correct in dismissing plaintiff's emotional distress claim, we reach that conclusion on different grounds than the trial court. We conclude that plaintiff's claim is precluded as a matter of law because: (1) there is no causation; and (2) plaintiff has not demonstrated severe emotional distress.
Because Kingsland prevailed upon its motion for summary judgment, appellate review of the trial court's ruling is limited to determining whether, reviewing the evidence in the light most favorable to the non-moving party, there was any issue of material fact, and whether Kingsland was entitled to prevail, as a matter of law. Brill, supra, 142 N.J. at 530, 666 A.2d 146.
A. Emotional Distress
The trial court's order, dated May 12, 2000, dismissed plaintiff's apparent remaining claim against Kingsland and Klein, namely, the claim that the intentional destruction of human remains amounted to extreme outrage, count IX of the second amended complaint. As already mentioned, we equate this claim of outrage with the tort of intentional infliction of emotional distress. What we have said concerning plaintiff's emotional distress claims against the City applies equally to such claims against Kingsland, with the possible exception of the tort of outrage.
Moreover, because Kingsland's lease of the property comprising a part of City Cemetery ended in 1990, Kingsland bore no responsibility for the state of the property in 1997, when plaintiff went to visit the cemetery and became emotionally distressed. Therefore, since Kingsland no longer had any interest in the formerly leased property in 1997, plaintiff cannot show that Kingsland was the proximate cause of her emotional distress.
In addition, as we have already discussed above, plaintiff's claims of emotional distress are precluded, as a matter of law, because of the insufficiency of her actually-sustained emotional distress to serve as a predicate for such claims.[13]
B. Denial of Due Process by Kingsland
Plaintiff asserts that Kingsland violated her due process rights when it entered into a lease with the City for a portion of City Cemetery. This claim has no merit.
Plaintiff argues that Kingsland's status as a private actor does not render it immune from her denial of property rights claim. For support, plaintiff cites two cases, Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) and Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).[14]
*751 Both Dennis and Adickes are easily distinguishable from this case, however. Each of those cases turned on evidence of willful and intentional misconduct between the private actor and the state. Here, even if plaintiff is deemed to have evidence of intentional misconduct, given the existence of paragraph thirty in the lease as suggesting Kingsland's knowledge of bodies in the leased premises and use of the property as a parking area, her evidence, construed most favorably to her, shows no cooperation between the City and Kingsland with the intent to deprive any persons of their property rights. The lease itself does not constitute such evidence of intent because the act of entering into a lease with a public entity cannot be construed as acting "under color of state law." See Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982) (discussing private actor liability in Fourteenth Amendment claims and noting that a private party can be liable only when it can "fairly be said to be a state actor," meaning when private party has acted together with a state official, obtained significant aid from state officials or because its conduct is otherwise chargeable to the state).
In any event, as we have already held, plaintiff's due process claim is insufficient as a matter of law because any property right she had in her father's remains was limited to one of burial or other lawful disposition of his body. Once a body has been buried, any rights the next of kin may have owned concerning the remains of a deceased relative are extinguished, and custody over the body vests in the Superior Court of New Jersey. In sum, Kingsland cannot have deprived plaintiff of any due process right because she had no cognizable interest on which such a protected right could be predicated.

IV
Plaintiff further contends that the trial court erred in dismissing her claims against the members of the City Council at the time of the approval of the City's 1975 lease of property to Kingsland because questions of fact remained as to whether the members were entitled to statutory immunity. This claim is without merit.
The trial court dismissed all claims against the individual City Council members in its order dated May 12, 2000. The court did so with little discussion, reasoning only that while there may have been an issue as to whether the City "itself acted appropriately or violated the statute," the individual defendants were immune from liability. The court stated: "But clearly, these individuals, both either under an absolute immunity or discretionary immunity, *752 should have their cases dismissed against them."
As with the other dismissed claims in this case, the standard of review is whether, considering the evidence in the light most favorable to the non-moving party, there was any issue of material fact, and whether the City was entitled to prevail, as a matter of law. Brill, supra, 142 N.J. at 530, 666 A.2d 146.
We need not reach the issue of immunity because plaintiff's claims against the individual Council members are duplicative of her claims against the City. Plaintiff asserts, against each member, that he or she: (1) violated plaintiff's due process rights; (2) committed the tort of desecration of grave and tombstone; and (3) negligently inflicted emotional distress. Since we have concluded earlier in this opinion that each of those claims is subject to dismissal on its merits, as a matter of law, the question of the Council members' immunity is moot or irrelevant. Specifically, plaintiff has no due process claim because she has no property right, and she has no desecration of gravestone and negligent infliction of emotional distress claim because she has failed to demonstrate severe and substantial emotional distress. For those same reasons, plaintiff's immunity (or lack thereof) argument is without merit. In addition, plaintiff's contention that her federal claims are not subject to the Tort Claims Act is unavailing. While it is true that the New Jersey Supreme Court held in Tice v. Cramer, 133 N.J. 347, 375, 627 A.2d 1090 (1993), that the Tort Claims Act does not provide state entities and employees immunity from federal claims, Tice is of no benefit to plaintiff because she has no viable federally protected property right to her father's remains. Nonetheless, because both plaintiff and the City discuss the issue of immunity, we briefly address plaintiff's argument that the City Council members' actions are not immune from suit.
The Tort Claims Act provides immunity for public officials in certain circumstances. N.J.S.A. 59:3-2 provides, in relevant part, that a public employee is not liable for an injury resulting from: (1) the exercise of judgment or discretion; (2) legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature. N.J.S.A. 59:3-3 further provides that a public employee is not liable if "he acts in good faith in the execution or enforcement of any law."
New Jersey courts have defined "good faith," in the context of the qualified immunity provided by N.J.S.A. 59:3-3, to mean objectively reasonable conduct. Hayes v. Mercer County, 217 N.J.Super. 614, 622, 526 A.2d 737 (App.Div.), certif. denied, 108 N.J. 643, 532 A.2d 226 (1987). Thus, the test is whether a public employee reasonably believed that his or her actions were lawful in light of clearly established laws. Delbridge v. Schaeffer, 238 N.J.Super. 323, 346, 569 A.2d 872 (Law Div.1989), aff'd sub nom., A.D. v. Franco, 297 N.J.Super. 1, 687 A.2d 748 (App.Div.1993), certif. denied, 135 N.J. 467, 640 A.2d 849 (1994), cert. denied sub nom., Delbridge v. Franco, 513 U.S. 832, 115 S.Ct. 108, 130 L.Ed.2d 56 (1994). Although in many cases, the question of good faith presents a question of fact, summary judgment is appropriate if public employees can establish that their acts were objectively reasonable or that they performed them with subjective good faith. Canico v. Hurtado, 144 N.J. 361, 365, 676 A.2d 1083 (1996). Moreover, ordinary negligence is an insufficient basis for holding a public employee liable under N.J.S.A. 59:3-3. Fielder v. Stonack, 141 N.J. 101, 123-25, 661 A.2d 231 (1995).
With respect to the immunity afforded to discretionary acts, we note that subsection *753 (a) of N.J.S.A. 59:2-3 has been interpreted as only granting immunity where the asserted discretionary decisions are "actual, high-level policymaking decisions" or "basic policy determinations." Costa v. Josey, 83 N.J. 49, 54-55, 415 A.2d 337 (1980). A discretionary act has been described as one involving planning and distinct from a ministerial act, which pertains merely to operations. Strauss v. Township of Holmdel, 312 N.J.Super. 610, 627, 711 A.2d 1385 (Law Div.1997).
In light of the foregoing, it is evident that the Council members' approval of the lease is subject to immunity. It required the members to decide whether or not to lease City-owned property or to keep the space for City purposes and implicated the Council's discretionary judgment. See also Morey v. Palmer, 232 N.J.Super. 144, 151, 556 A.2d 811 (App.Div.1989).
Thus, even if plaintiff's claims against the individual City Council members were legally sufficient on other bases, as a matter of law these claims would still be barred because the members are entitled to immunity. The record indicates that the members acted in good faith in approving the 1975 lease of a portion of the City Cemetery to Kingsland and that this approval was a discretionary decision, thereby entitling them to the protections of N.J.S.A. 59:3-2 and 3-3.

V
We finally address plaintiff's argument which focuses on the public policy concerns implicated in her action. Plaintiff contends that the trial court failed to appreciate the significance of the issues in this case and the protracted and intentional course of misconduct by defendants. Plaintiff claims that the defendants' conduct is particularly egregious and violative of the public policy of this State because it "struck at one of the basic elements of civilized humanity: the right to attend to the disposition of the bodies of the deceased." Plaintiff's argument is unpersuasive, however.
The trial court clearly appreciated the gravity of the City's mishandling of City Cemetery. At the October 20, 2000 hearing, the court began its discussion of the motion by noting that the City had done, "something inappropriate, and not to mention the fact distressing," by paving over City Cemetery and using it for various reasons, "including but not limited to a dumping ground." The court then added:
But the cause of action for the eighty year old woman whose father has been dead since 1921, number one, aside from the fact that on an emotional basis it's a terrible, terrible situation; where does the law, as our law presently isis prescribed, either by statute or case law, give any entitlement for emotional distressand I'm going to assume for the purpose of this argument that this is an absolute atrocity. It's a terrible thing to do, you know, it's a Potter's Field that's paved over, et cetera. Where in the law is there a cause of action for the emotional distress under these circumstances?
The trial court was correct in concluding that plaintiff had no action at law against the City because, as we have stated, plaintiff's various claims were precluded for various reasons, including the failure to state the elements of a claim. The State's public policy in favor of the maintenance and preservation of cemeteries in respect of the dead cannot override plaintiff's inability to allege actionable claims.
We note that the dismissal of plaintiff's Law Division action in its entirety does not leave plaintiff without relief. Her companion action in the Chancery Division was *754 resolved on February 15, 2001, by way of a consent order. That order requires the City to restore City Cemetery and maintain it as an appropriate memorial park, reflecting its use as a cemetery, by:
erecting [on a prescribed schedule] a secure perimeter with appropriate entrance, landscaping, adequate ground cover (natural plants, grass or pavings stones), benches or suitable areas for visitors, plaque or memorial identifying the area as cemetery[.]
The terms of the consent order require the City to make amends for its misuse of City Cemetery by restoring the grounds to a proper place of memorial and to comply with all applicable statutes. The consent order clearly directs the City to comply with this State's public policy of respecting the sanctity of burial grounds. Therefore, it would be a mistake to conclude that the public policy of New Jersey is being neither considered nor vindicated.

VI
For the reasons we have articulated, the orders appealed from are affirmed.
NOTES
[1] Plaintiff also points to N.J.S.A. 8A:5-18, which provides the order of priority in determining the "right to control the disposition of the remains of a deceased person[.]" That statute gives priority to the surviving spouse, and then to surviving children. Although plaintiff merely cites the statutory section without discussion, we assume she contends that N.J.S.A. 8A:5-18 provides her with the right to control her father's remains, and that she therefore has a property right to her father's body.
[2] The decedent's children sought an injunction on the grounds that because their father and the widow had been estranged for four years, and because their father was a member of the royal chieftaincy of Liberia, they should have the right to decide their father's interment, which in accordance with royal rules required the return of his body to Liberia. Id. at 645, 750 A.2d 229. The court denied the request for an injunction because N.J.S.A. 8A:5-18 prioritized the surviving family's right to control the disposition of the dead, according preference to the surviving spouse.
[3] We observe, moreover, that cases outside this State indicate that a surviving family's property right in the deceased's remains is restricted to possession for burial or other lawful disposition. Even the case that plaintiff cites in support of her claim, Crocker v. Pleasant, 778 So.2d 978 (Fla.2001), limits its holding to that proposition. Crocker is also instructive for its review of the case law on the nature of the surviving kin's property right in a decedent as being this: when courts have found a property interest, the interest has been restricted to one of preventing mutilation or damage to the body and allowing possession of the body for the purpose of burial or other lawful disposition. See, e.g., Whaley v. County of Tuscola, 58 F.3d 1111, 1115-16 (6th Cir.1995), cert. denied, 516 U.S. 975, 116 S.Ct. 476, 133 L.Ed.2d 404 (1995). See also, Brotherton v. Cleveland, 923 F.2d 477, 480-82 (6th Cir.1991); Fuller v. Marx, 724 F.2d 717, 719 (8th Cir.1984); Lawyer v. Kernodle, 721 F.2d 632, 634 (8th Cir.1983).
[4] The City devotes a considerable portion of its brief to whether plaintiff has a liberty interest or can claim a substantive due process violation. Plaintiff has not claimed such a violation, however, but has limited her due process allegation to the denial of a property right, and thus we do not address the issue of substantive due process rights.
[5] N.J.S.A. 40:60-51.8 actually would seem to be the more applicable statutory section. N.J.S.A. 40:60-51.8 states that whenever a municipality owns land which has been used for the burial of indigents but the land has not been used for such purpose for twenty or more years, the governing body of the municipality may, by resolution, determine that it is in the best interests of the municipality to reinter the bodies to a more suitable place. The statute requires that the governing body adopt a resolution and hold a public hearing prior to the adoption of the resolution, which hearing shall be noticed by an advertisement published in a newspaper once each week for two weeks.
[6] For example, the City's violation of N.J.S.A. 8A:8-3, if any, occurred in 1903; the City's violation of N.J.S.A. 26:6-34, occurred in 1921, the date of plaintiff's father's death, or at the latest in 1977, which is the date when the City began to keep burial and death records and presumably, is the latest date when any prior records were destroyed; and lastly, most of the City's violations of N.J.S.A. 40:60-41 occurred in the 1950s through 1970s, when the City installed the sewer pipeline, leased the land to Kingsland and paved over a portion of the cemetery.
[7] N.J.S.A. 8A:2-1 establishes a New Jersey Cemetery Board, located within the Division of Consumer Affairs in the Department of Law and Public Safety. Pursuant to N.J.S.A. 8A:2-2, the board is responsible for the supervision and regulation of all cemetery companies.
[8] When plaintiff's counsel responded to the court that plaintiff saw the City Cemetery being used as a garbage dump, the court stated:

But shebut she doesn'tshe didn't see anything that would actuallywhile in her mind, and I'm not saying it is wrong, the feeling that the father was there at some point in time, but she didn't actually see somethingand I know it's drawing a fine line but that's what the law is required to do.
On the issue of whether the harm had occurred too many years ago, the trial court stated in its ultimate ruling that "I think the circumstances here, even if we had the capability of the cause of action, are so far removed that, as a matter of law, it's not appropriate for this Court to allow the case to proceed."
[9] With respect to developments in the law concerning a bystander's posited "right to seek a just recompense for real emotional injuries inflicted by a defendant's negligence when the injuries are based upon authentic emotional attachments that are deep, genuine, and enduring[,]" see Howard H. Kestin, The Bystander's Cause of Action for Emotional Injury: Reflections on the Relational Eligibility Standard, 26 Seton Hall L.Rev. 512, 540 (1996).
[10] See, e.g., Bennett v. 3 C Coal Co., 180 W.Va. 665, 379 S.E.2d 388, 394 (1989); Carney v. Knollwood Cemetery Ass'n, 33 Ohio App.3d 31, 514 N.E.2d 430, 432-33 (1986); Louisville Cemetery Ass'n v. Shauntee, 376 S.W.2d 533, 535-36 (Ky.1964).
[11] See also Decker, supra, 116 N.J. at 431, 561 A.2d 1122 (plaintiff had not suffered substantial emotional distress from fake report of her death because her distress approximated "the subjective reactions of ordinary persons who feel victimized by the false report of death, namely, annoyance, embarrassment, and irritation" and claim of negligent infliction of emotional distress must be rejected as a matter of law); Lacy, supra, 745 F.Supp. at 1036 (emotional distress suffered by parents of deceased son was not sufficiently severe, where parents grieved and could not sleep but had not sought psychiatric treatment).
[12] During the pendency of her suit, plaintiff was examined by three doctors, Dr. Latimer, at the request of her own counsel, and Drs. Karetzky and Laikin, both at the request of the City. Dr. Latimer, a psychiatrist, opined that plaintiff appeared "depressed and anxious and cried during her interview" and had "a depressed mood and energy level." He also noted that she was "alert, intelligent and pleasant" and told him that she had "good and bad days. I feel better because I am doing something about my father." One of the other doctors attributed plaintiff's depression to other illnesses and the second noted no "major depression."
[13] Although Kingsland argues that the trial court was correct in dismissing plaintiff's claims of both intentional and negligent infliction of emotional distress against Kingsland, plaintiff never asserted a claim of negligent infliction of emotional distress against Kingsland. The remaining claim against Kingsland, count IX of the complaint, asserted the "negligent, willful and intentional destruction of human remains amounting to extreme outrage." Although the claim appears to include an allegation of negligence, it is evident from language further in the count that the claim alleges "extreme and outrageous" conduct, which are elements of intentional infliction. We have no doubt that plaintiff knew how to plead a claim of negligent infliction of emotional distress since she alleged separate counts of negligent and intentional infliction against the City and the City Council members. Therefore, the only claim against Kingsland that we address on appeal is the claim of intentional infliction of emotional distress.
[14] In Dennis, the United States Supreme Court held that a private corporation, which had bribed a state court judge, could be construed as acting "under color of" state law for purposes of a denial of due process claim filed under 42 U.S.C.A. § 1983. Dennis, supra, 449 U.S. at 27-28, 101 S.Ct. at 186, 66 L.Ed.2d at 190. In that case, the corporation conspired with the judge to ensure that an injunction would be issued against the plaintiff's production of minerals from certain oil leases. Id. at 25, 101 S.Ct. at 185, 66 L.Ed.2d at 188. Although the judge was immune from suit and the corporation was not an officer of the state, the Court concluded that the corporation was not immune because it was "enough that [it was] a willful participant in joint action with the State or its agents." Id. at 27, 101 S.Ct. at 186, 66 L.Ed.2d at 189.

In Adickes, the United States Supreme Court reversed an order of summary judgment against the plaintiff who had been denied service in the defendant's restaurant because she was in the company of African-American students. Adickes, supra, 398 U.S. at 157, 90 S.Ct. at 1608, 26 L.Ed.2d at 152. The Court stated that the plaintiff could make out a violation of her constitutional rights if she could show that a restaurant employee and a city policeman had somehow reached an understanding to deny the plaintiff service in the restaurant. Id. at 152, 90 S.Ct. at 1605, 26 L.Ed.2d at 151. The Court added that the restaurant could be liable, regardless of whether the police officer's actions were officially authorized or lawful. Id. at 152, 90 S.Ct. at 1606, 26 L.Ed.2d at 151.