930 A.2d 1223 (2007)
396 N.J. Super. 1
J.H., Plaintiff-Appellant,
v.
MERCER COUNTY YOUTH DETENTION CENTER and County of Mercer, Defendants-Respondents, and
Monet Mason, Defendant.
Superior Court of New Jersey, Appellate Division.
Submitted August 21, 2007.
Decided August 29, 2007.
*1225 Gregory Gogo, attorney for appellant.
Arthur R. Sypek, Jr., Mercer County Counsel, attorney for respondents (Lillian L. Nazzaro, Assistant County Counsel, on the brief).
Before Judges STERN, LISA and HOLSTON, JR.
The opinion of the court was delivered by
HOLSTON, JR., J.A.D.
In this case, plaintiff, J.H., filed a Law Division complaint alleging child sexual abuse under the Child Sexual Abuse Act (CSAA), N.J.S.A. 2A:61B-1, and other common-law causes of action. Plaintiff sought compensatory and punitive damages for his emotional distress which he alleges was proximately caused by sexual abuse inflicted upon him by defendant, Monet Mason,[1] an adult youth worker at defendant, Mercer County Youth Detention Center (Detention Center),[2] when he was a minor being detained in the Detention Center. The Detention Center is operated by defendant, Mercer County, under the direction of the Mercer County Department of Human Services (DHS).[3]
N.J.S.A. 2A:61B-1 states in applicable part: "`Sexual abuse' means an act of sexual contact or sexual penetration between a child under the age of 18 years and an adult. A . . . guardian or other person standing in loco parentis within the household who knowingly permits or acquiesces in sexual abuse by any other person also commits sexual abuse."
In this appeal we must determine whether the Detention Center constitutes a "person standing in loco parentis within the household" of plaintiff under the CSAA within the meaning of N.J.S.A. 2A:61B-1. See Hardwicke v. American Boychoir School, 188 N.J. 69, 902 A.2d 900 (2006). For the reasons that follow, we hold that the Detention Center falls within the statutory definition of a "person standing in loco parentis within the household" of plaintiff under the CSAA.
We must also determine whether the immunities granted to public entities under the New Jersey Tort Claims Act (TCA) provisions, N.J.S.A. 59:2-10 and N.J.S.A. 59:9-2(c) and (d), bar plaintiff's causes of action against the County defendants both under the CSAA and under the common-law torts of negligence and intentional infliction of emotional distress. We hold that the TCA does not bar plaintiff's claims under the CSAA for compensatory and punitive damages but plaintiff's failure to meet the medical expense threshold of the TCA bars his common-law claims against the County defendants.
On October 8, 2003, plaintiff filed a four-count complaint against the County defendants and Mason. Plaintiff sought compensatory *1226 and punitive damages based on violations of the CSAA (first count); common-law negligence (count two); intentional infliction of emotional distress (count three), and for punitive damages on the common-law claims (count four).
On December 5, 2005, the motion judge granted partial summary judgment dismissing with prejudice counts two, three and four and on January 23, 2006, granted summary judgment as to count one and denied plaintiff's motion for reconsideration of its December 5, 2005 ruling. The court's December 5, 2005 and January 23, 2006 oral opinions were memorialized in the court's order of January 23, 2006 and amended order of February 2, 2006.
The motion judge in granting summary judgment to the County defendants found that the CSAA does not apply to public entities and that plaintiff's common-law claims were barred by the limitation of damages provisions of the TCA, N.J.S.A. 59:9-2(c) and (d). Based on the court's analysis of the parties' factual contentions, the court determined that those in a supervisory position at the Detention Center were not proven to have knowledge of Mason's sexual abuse of plaintiff. Because in sexually abusing plaintiff, Mason was engaged in willful misconduct outside the scope of her employment, the court also determined that, as public employers, the County defendants cannot be held vicariously liable for Mason's intentional torts and are immune from liability pursuant to N.J.S.A. 59:2-10 and our decision in Cosgrove v. Lawrence, 215 N.J.Super. 561, 563, 522 A.2d 483 (App.Div.1987). We affirm the court's dismissal of counts two, three and four and reverse the court's dismissal of count one.
The factual contentions underlying this appeal are in dispute. Applying the standard for summary judgment motions contained in Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535-36, 666 A.2d 146 (1995), we state the facts viewed in the light most favorable to plaintiff.
On November 22, 2002, at age seventeen, plaintiff was placed in the Detention Center and remained there until he was released on May 21, 2003. From the date of his detention until his birthday on March 7, 2003, plaintiff was a minor under the age of eighteen.
On or about December 5, 2002, Mason, age twenty-four, a female youth worker employed by the Detention Center, and a person who had supervisory authority over plaintiff, initiated a sexual relationship with plaintiff. Mason continued the sexual relationship with plaintiff until he was released from the Detention Center and, thereafter, until June 15, 2003, when plaintiff terminated the relationship. Plaintiff claims he acquiesced in Mason's sexual demands while a minor and detainee at the Detention Center because he feared her, i.e., he was concerned Mason would fabricate complaints against him, including making false charges against him, thereby prolonging his detention if he refused her advances.
While plaintiff was a minor and detainee at the Detention Center, Mason coerced and manipulated him by providing him with "goodies" including cigarettes, pornographic magazines, cognac, and a lubricant for use when engaging in anal intercourse. The sexual acts Mason enticed him to engage in with her on a regular basis in his room at the Detention Center and elsewhere in the facility were vaginal intercourse, anal intercourse and the performance of oral sex on him.
Plaintiff told youth worker supervisor, Ronald Matlock, that Mason was giving him cigarettes as a bribe and told Matlock about his sexual relationship with Mason, but Matlock did nothing to stop Mason's sexual advances. The sexual relationship between Mason and plaintiff was known to *1227 Debbinique McBride, another youth worker at the detention center, who initiated a like sexual relationship with A.B., another minor detainee.
Llionel Henderson, the Detention Center superintendent, stated that after December 5, 2002 and into the year 2003, there were several incidents in the building involving contraband which was found during shakedowns. Henderson believed that the contraband found was brought into the Detention Center by staff members Mason and McBride to give to plaintiff and A.B., with whom they were fraternizing. Henderson also confirmed that in early February 2003, after conducting a shakedown in the yellow pod where plaintiff was housed, holiday liquor bottle gift bags, pornographic material and a lubricant which plaintiff and A.B. claimed they received from staff were found.
C.K., another detainee, recalled that sometime between February and mid-April 2003, he saw "on an every day-every other day basis" Mason go into plaintiff's room and remain there from one-half hour to an hour. He stated that as a result of being questioned by youth worker Keith Williams, C.K. made Williams aware of Mason going into plaintiff's room.
On his March 7, 2003 birthday, plaintiff became intoxicated. Youth worker Gerard Sanders discovered liquor bottles and told Henderson that Mason and McBride had brought plaintiff alcohol. Shortly thereafter, Sanders told Henderson of his suspicion that Mason had become too familiar with plaintiff and A.B. because she was always taking her breaks in their pod. As a result, Mason's 3-11 p.m. supervisor was made aware of the suspicions involving Mason and McBride. An official incident report dated May 8, 2003 notes that personal lubricant and one adult magazine were found in plaintiff's room.
Plaintiff alleges that Matlock, Williams and Sanders knew or should have known Mason was subjecting him to sexual abuse and permitted or acquiesced in Mason's sexual abuse of him contrary to the CSAA. Alternatively, Detention Center supervisors were negligent in their failure to exercise, on behalf of the County defendants, their non-delegable duty to insure plaintiff's safety from child sexual abuse. Therefore, the County defendants were liable for the common-law torts of negligence and the intentional infliction of emotional distress for the sexual abuse perpetrated upon him by Mason.
Plaintiff contends as a result of the sexual abuse by Mason and because of the Detention Center's youth workers' and supervisors' failure to stop the abuse that he suffers from sleep interruption, nightmares and flash-backs, has self-medicated by abusing alcohol, and is sexually dysfunctional. As a result, after a psychiatric evaluation in January 2004, by a psychiatrist at Catholic Charities who diagnosed plaintiff with post-traumatic stress disorder (PTSD), characterized by recurrent intrusive thoughts of the traumatic experiences and disorganization of his thinking patterns due to those intrusive thoughts, plaintiff underwent psychotherapy on ten occasions at Catholic Charities from January 3, 2004 until June 2004. Plaintiff, in addition, was prescribed the psychotropic medications Lexapro and Paxil. Plaintiff incurred medical expenses of $1300 for the psychotherapy and medical management.
In a January 11, 2005 medical report Dr. Richard Rubin, a psychiatrist retained by plaintiff, rendered an opinion based on his examination of plaintiff and review of Catholic Charities' progress notes. Dr. Rubin opined that the "events" which occurred to plaintiff while he was a minor detained in the Detention Center combined with his preexisting personality disorder, based on his substantial juvenile arrest history, have caused him permanent emotional *1228 damage. Dr. Rubin stated that treatment would merely be an attempt to ameliorate the situation and prevent his condition from becoming worse. In a certification, attached to plaintiff's supplemental brief in support of reconsideration of summary judgment on his common-law claims for failure to reach the monetary threshold of N.J.S.A. 59:9-2(d) of $3600, Dr. Rubin opined that future effective treatment for plaintiff will total $30,000.
Plaintiff presents the following arguments for our consideration:
POINT I: BECAUSE THE CSAA, BY ITS TERMS, APPLIES TO PUBLIC ENTITIES, THE MOTION JUDGE COMMITTED PLAIN ERROR IN GRANTING SUMMARY JUDGMENT ON THE GROUNDS THAT THE CSAA DID NOT APPLY TO THE COUNTY DEFENDANTS.
POINT II: THE MOTION JUDGE COMMITTED PLAIN ERROR BY APPLYING AN IMPROPER STANDARD OF "PROOF" AND IGNORING PLAINTIFF'S FACTUAL ALLEGATIONS AS WELL.
POINT III: AS THE PLAINTIFF HAS SATISFIED THE NECESSARY CONDITIONS TO PURSUE A TORT CLAIM, IT WAS PLAIN ERROR FOR THE COURT TO DISMISS PLAINTIFF'S TORT CLAIM ACT ALLEGATIONS.

I.
We first address plaintiff's CSAA claim. The County defendants argue that none of the requirements for the imposition of liability under the CSAA apply to them. They contend that as municipal corporations they are not "persons," they do not stand "in loco parentis" to the juveniles in the Detention Center because as juvenile inmates the residents are prisoners, and the Detention Center is not a "household." Further, the County defendants assert that persons in a supervisory role at the Detention Center did not knowingly permit or acquiesce in Mason's sexual abuse of plaintiff.
The Supreme Court's decision in Hardwicke, supra, guides our analysis of these contentions. In Hardwicke, a student, living at and attending the American Boychoir School (School) was sexually assaulted by the music director on an almost daily basis. Id. at 75, 902 A.2d 900. The Court held that under the CSAA, a private boarding school, a non-natural person, was a "person standing in loco parentis within the household" and was subject to liability. Id. at 94, 902 A.2d 900. The Court further concluded that an employer can be held vicariously liable for the acts of its employees acting outside the scope of their employment for child abuse claims brought under the passive abuser provision of the CSAA. Id. at 94, 902 A.2d 900. The Court thus determined that the CSAA establishes two classes of abusers: those persons who inflict the abuse (active abusers) and those persons who stand "in loco parentis" within the "household" who know of the abuse and fail to protect the child (passive abusers). Hardwicke, supra, 188 N.J. at 86, 902 A.2d 900.

A.
We begin our analysis by determining whether the County Detention Center is a "person" within the meaning of the CSAA. The primary question in Hardwicke was whether the School could be a person under the statute. Id. at 87, 902 A.2d 900. The School contended that the term person based on the ejusdem generis rule of statutory construction could only apply to a natural person and not a corporation. *1229 Ibid. Hardwicke contended, based on this court's construction of the statute, see Hardwicke v. American Boychoir School, 368 N.J.Super. 71, 90, 845 A.2d 619 (App.Div.2004), that the term "guardian" is not limited in scope but includes the Division of Youth and Family Services (DYFS), a government agency and "non-natural or artificial person," which often serves as a guardian to children. Id. at 87, 845 A.2d 619. Hardwicke additionally pointed out that under N.J.S.A. 1:1-2 "person" includes corporations as well as individuals, "`unless restricted by its context to an individual as distinguished from a corporate entity or specifically restricted to such' an entity" and that the CSAA did not restrict the use of the word "person" either explicitly or by its context. Id. at 88, 845 A.2d 619.
Because the CSAA does not define the terms "person standing in loco parentis within the household," and the plain meaning of the statute is not apparent on its face, the Court turned to extrinsic interpretive aids to determine who could be a "passive abuser" under the CSAA. Id. at 86, 88, 845 A.2d 619. The Court, after examining the statute's legislative history, agreed with Hardwicke's arguments, that amendments to the CSAA evince a legislative intent to interpret broadly "the classes of active and passive abusers subject to suit." Id. at 89, 845 A.2d 619. The Court agreed that DYFS' service as a "guardian" of minor children undercut the argument that only natural persons can be persons within the meaning of the CSAA. Ibid. The Court further noted that the designation of a corporation as a person for certain purposes in a statute is not unusual because a corporation can act only through its officers, directors, agents, and servants. Ibid. (citations omitted). The Court stated that interpreting the CSAA broadly "comports with the legislative goal to interpret remedial statutes liberally." Id. at 90, 845 A.2d 619. The Court concluded: "In light of the language of the statute as supplemented by the definition of person in Title I, the extrinsic evidence of legislative intent, and the State's strong policy to hold both active and passive child abusers accountable, we find that the School is a person under the passive abuse provision of the CSAA." Ibid.
As respects the County defendants here, N.J.S.A. 1:1-2 defines "person" to include corporations but does not specifically include municipal corporations within that definition. However, in Hartman v. City of Brigantine, 42 N.J.Super. 247, 254-55, 126 A.2d 224 (App.Div.1956), aff'd, 23 N.J. 50, 127 A.2d 401 (1957), we stated "counties are municipal corporations, being expressly declared to be bodies corporate by [N.J.S.A. 40:18-1] and there is no reason why the definition of `person' in the [statute] as including `corporations,' undifferentiated as between commercial and public corporations, should be held to mean only the former." Thus for purposes of liability under the Wrongful Death Act, N.J.S.A. 2A:31-6, we found that counties were intended to be within the definition of corporations subject to liability under that statute. Ibid.
Thus, we conclude that a county, as a municipal corporation, is a corporation included within the definition of person contained in N.J.S.A. 1:1-2 and thus constitutes a "person" under the CSAA.

B.
We next address whether the Detention Center was "in loco parentis" to plaintiff. The Court in Hardwicke determined that the School stood "in loco parentis to Hardwicke." The Court noted that the term is defined literally as "in the place of a parent" and as "relating to or acting as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent." Id. at 91, 902 *1230 A.2d 900 (quoting Black's Law Dictionary, 803 (8th ed.2004)). Citing favorably from our decision in Hardwicke, the Court held that the School, by providing students with "necessary shelter, food, education, recreation and succor," acted in place of their parents. Ibid. (quoting Hardwicke, supra, 368 N.J.Super. at 87, 845 A.2d 619). The Court noted that the "School Policies" included in the House Parent Handbook for 2000-2001, containing a section entitled "In Loco Parentis," echoed that view. Id. at 92, 845 A.2d 619. The handbook stated: "As substitute parents for these boys, we must always try to think of how their real parents might handle a particular situation and therefore exercise the best possible judgment." Ibid. The Court concluded that the School's view of its role vis-à-vis its students was accurate and there was more than sufficient indicia of the exercise of parental authority to bring the school within the in loco parentis requirement. Hardwicke, supra, 188 N.J. at 92-93, 902 A.2d 900.
The Court quoted from its earlier decision in Frugis v. Bracigliano, 177 N.J. 250, 827 A.2d 1040 (2003), in which the Court affirmed a directed verdict against a board of education for negligence and negligent supervision in a case arising from the conviction of the defendant principal of an elementary school for official misconduct arising out of the principal's photographing elementary school boys in sexually suggestive poses in the school office. The Court in Frugis stated:
The law imposes a duty on children to attend school and on parents to relinquish their supervisory role over their children to teachers and administrators during school hours. While their children are educated during the day, parents transfer to school officials the power to act as the guardians of those young wards. No greater obligation is placed on school officials than to protect the children in their charge from foreseeable dangers, whether those dangers arise from the careless acts or intentional transgressions of others. Although the overarching mission of a board of education is to educate, its first imperative must be to do no harm to the children in its care. A board of education must take reasonable measures to assure that the teachers and administrators who stand as surrogate parents during the day are educating, not endangering, and protecting, not exploiting, vulnerable children.
[177 N.J. at 268, 827 A.2d 1040.]
In this case, we look to the Code of Juvenile Justice for an evaluation of the relationship between the Detention Center and its detainees. One of the purposes of the Code enumerated in N.J.S.A. 2A:4A-21 is:
e. To insure that children under the jurisdiction of the court are wards of the State, subject to the discipline and entitled to the protection of the State, which may intervene to safeguard them from neglect or injury and to enforce the legal obligations due to them and from them[.]
Thus a county detention center, as an instrumentality of the Code of Juvenile Justice, operates in the traditional role of a guardian toward its ward. See Black's Law Dictionary, 535, 1420 (5th Ed.1968) (defining guardian as, "[a] person lawfully invested with power, and charged with the duty, of taking care of the person . . . who, for defects of age, understanding, or self control, is considered incapable of administering his own affairs," and ward as "[a] person especially a child . . . placed by the court under the care of a guardian.").
We also note that the Detention Center webpage describes the Detention Center as follows:
Operated under the Mercer County Department of Human Services, The Youth *1231 Detention Center provides a structured, safe and secure environment for all Mercer County Youth detained for juvenile court. It is important that the "Youth House" provides the basic needs such as shelter, clothing, food, medical and education and establishes a staging ground for those youth in need of services and treatment. The functions and duty's of the agency are performed by 44 direct care staff and 29 operational and support staff. These staff deliver services to an average of 66 youth per day and 665 youth per year.
The Youth Detention Center offers a variety of programs and services. All youth are allowed to and must self select for participation in our Drug and Alcohol Awareness services, Religious Services, Psychological and Psychiatric support groups, Medical and Health programming, Mentoring provided by DADS, Planned Parenthood programming, [and] Anger Management. Life Skills and recreation are the bases of our GGI, (Guided Group Interaction) and BMP or Behavior Modification Program (BMP).
Last year we Serviced a total of 661 youth for an average of 37.5 and a total of 24787.5 bed days.
[http://nj.gov/counties/mercer/ departments/hs/detention.html.]
Thus, it is apparent that the Detention Center views its role vis-à-vis the youth committed to its care as acting "in loco parentis." Additionally, the Court in Hardwicke, supra, pointed out that typically the "in loco parentis" relationship is, as is the case with the Detention Center, temporary in nature. 188 N.J. at 91, 902 A.2d 900. Finally, inasmuch as N.J.S.A. 2A:4A-21 in effect describes the State in subsection e as a guardian and identifies the children under the jurisdiction of the court as "wards," and in light of the statutory obligations imposed on the Detention Center, we conclude that the County defendants stand "in loco parentis" to plaintiff.

C.
We next evaluate whether the Detention Center is a "household" within the meaning of the CSAA. We are convinced, in light of the services statutorily required to be provided to juveniles in its care, see N.J.S.A. 2A:4A-21, and in view of the stated services which the Detention Center acknowledges it provides as contained in its website description, that the Detention Center is a "household" within the meaning of the CSAA.
The Supreme Court in Hardwicke reminded that a series of decisions have interpreted the word "household" in varying contexts to include persons other than a family member. "Household" is, therefore, "not a word of art [and][i]ts meaning is not within certain commonly known and universally accepted limits." 188 N.J. at 93, 902 A.2d 900 (quoting Mazzilli v. Accident & Cas. Ins. Co., 35 N.J. 1, 18, 170 A.2d 800 (1961)). Rather, the Court stated, "what the word household means depends on the circumstances of the case and has not been restricted to persons with familial relations." Ibid. In concluding that the School was a "household" under the CSAA, the Court noted that the School provided "food, shelter, education, instruction, recreational activities, and emotional support to its fulltime boarders." Id. at 94, 902 A.2d 900. Similar services are provided to the youth, such as plaintiff, who are detained in the Detention Center. We, therefore, conclude that the Detention Center is a "household" under the CSAA.
We hold, therefore, that the County defendants are within the definition of "other person standing in loco parentis within the household" of plaintiff against which liability may be imposed under the CSAA if the Detention Center is proven to have knowingly *1232 permitted or acquiesced in sexual abuse committed by Mason with plaintiff when he was a child under the age of eighteen years.

II.
The County defendants claim, however, that the TCA immunizes them from liability for statutory claims under the CSAA. They argue that pursuant to N.J.S.A. 59:2-1, in accordance with the 1992 Task Force comment, "public entities are immune from liability unless they are declared to be liable by an enactment."
The motion judge in finding the CSAA inapplicable to the County defendants concluded that there was no language in the CSAA which specifically applies the provisions of the CSAA to public entities. The judge thus concluded that the County defendants were immunized from liability by the immunity provisions of the TCA. The County defendants, therefore, argue that if the Legislature intended for the CSAA to abrogate the immunities of the TCA and apply liability to public entity defendants, the language imposing such liability would be clear and unambiguous.
The TCA was adopted in 1972. L. 1972 c. 45, § 1. The CSAA was adopted in 1992, and amended in 1999 and 2004. L. 1992, c. 109, § 1, amended by L. 1999, c. 393, § 1, L. 2004, c. 130, § 10 effective 2004. It is a well established rule of statutory construction that where two statutes appear to be in conflict, and one is general in nature and the other specific, the conflict is resolved in favor of the more specific. State v. Gerald, 113 N.J. 40, 83, 549 A.2d 792 (1988); Kingsley v. Wes Outdoor Adver. Co., 55 N.J. 336, 339, 262 A.2d 193 (1970). Likewise, where a subsequent legislative enactment clearly conflicts with an earlier statute affecting the same subject matter, courts will find the legislative intent to supercede the earlier law. Kemp v. State, 147 N.J. 294, 306-07, 687 A.2d 715 (1997); Café Gallery, Inc. v. State, 189 N.J.Super. 468, 460 A.2d 227 (Law Div. 1983).
The Supreme Court observed in Hardwicke, supra, that the CSAA established the first statutory cause of action for sexual abuse in New Jersey. 188 N.J. at 84, 902 A.2d 900. Prior to 1992, victims of sexual abuse were limited to common-law theories of assault, battery, and intentional infliction of emotional distress. Id. at 85, 902 A.2d 900. Because the CSAA was enacted and amended subsequent to the TCA and is more specific with regard to the welfare of sexually abused children, we conclude, for the reasons that follow, the CSAA was intended to supercede TCA immunity to the County defendants.

A.
The County defendants assert that plaintiff's CSAA claim must fail under the general concepts of respondeat superior liability espoused in Cosgrove, supra, 215 N.J.Super. at 563, 522 A.2d 483. The County defendants contend that based on the statutory limitations contained in the language of the TCA at N.J.S.A. 59:2-2 with respect to negligent conduct of an employee outside the scope of the employee's employment, and at N.J.S.A. 59:2-10 with respect to acts of an employee constituting willful misconduct, they are immune from liability.
Hardwicke is again instructive with respect to this contention. The Court, relying on § 219 of the Restatement (Second) of Agency § 219(2)(c) to (d) (1958), and Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 619-20, 626 A.2d 445 (1993), determined that under modern principles of agency law liability of an employer for the torts of an employee acting outside the scope of his employment is permitted when the conduct violates a non-delegable duty of the employer. 188 N.J. at 101, 902 A.2d *1233 900. The Court pointed out that in Lehmann the Court adopted Section 219 of the Restatement as the framework for evaluating employer liability in hostile environment sexual harassment claims brought under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, even when the employee was acting outside the scope of his or her employment. Ibid. The Court stated that an employer could be held vicariously liable under Section 219(2)(d) of the Restatement "if an employer [had] delegate[d] authority to control the work environment to a supervisor and [the] supervisor abuse[d][the] delegated authority." Ibid. (quoting Lehmann, supra, 132 N.J. at 620, 626 A.2d 445).
The Court also pointed out that the Lehmann holding was extended to claims brought under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, in Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 417, 650 A.2d 958 (1994). This extension was based on the reasoning that both the CEPA and the LAD effectuate important public policies to "overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers." Hardwicke, supra, 188 N.J. at 102, 902 A.2d 900 (quoting from Abbamont, supra, 138 N.J. at 418, 650 A.2d 958).
The Court then held that the considerations which informed the Court's analysis in Lehmann and Abbamont applied equally to claims predicated on facts indicating child abuse under the CSAA. Ibid. The Court concluded that the "CSAA recognizes the vulnerability of children and demonstrates a legislative intent to protect them from victimization" and that claims based on child abuse are supported by the rationale that those in the best position to know the abuse are in the best position to stop it. Ibid. The Court determined that the application of Section 219(2)(d) of the Restatement, imposing liability on an employer for the torts of its employee committed while acting outside the scope of his employment when the conduct violated a non-delegable duty of the employer, applies to CSAA claims against the employer. Id. at 101-02, 650 A.2d 958; see also Frugis, supra, 177 N.J. at 250, 827 A.2d 1040 (recognizing as fundamental a school board's heightened duty to protect the children in its care).
The logical extension of the Court's rationale in Hardwicke supports a finding that the passive abuser liability provision of the CSAA was intended to supersede in a child sexual abuse case any conflicting limitation of action provision against public entities contained in the TCA. The Court cited a long list of remedial statutes that have as the paramount goal of the Legislature to keep children safe and to identify those who facilitate their abuse. Id. at 90, 902 A.2d 900.
We thus determine that modern principles of vicarious liability contained in the Restatement, supra, § 219(2)(c) would apply to the actions of the supervisors of the Detention Center who violated the Detention Center's non-delegable duty to protect the juveniles entrusted to its care from sexual abuse at the hands of employees granted supervisory authority over them. Therefore, the passive abuser liability provision of the CSAA applies to the County defendants.

B.
The County defendants contend, however, that even if plaintiff is entitled under the CSAA to pursue a cause of action for compensatory damages, N.J.S.A. 59:9-2(c) precludes an award of punitive damages against a public entity.
The damages provision of the CSAA at N.J.S.A. 2A:61B-1(h) provides:

*1234 A plaintiff who prevails in a civil action pursuant to this act shall be awarded damages in the amount of $10,000, plus reasonable attorney's fees, or actual damages, whichever is greater. Actual damages shall consist of compensatory and punitive damages and costs of suit, including reasonable attorney's fees. Compensatory damages may include, but are not limited to, damages for pain and suffering, medical expenses, emotional trauma, diminished childhood, diminished enjoyment of life, costs of counseling, and lost wages.
[(Emphasis added).]
N.J.S.A. 59:9-2(c) provides that "[n]o punitive or exemplary damages shall be awarded against a public entity." However, the Supreme Court held in Abbamont, supra, that where the public entity is an employer and a successful claim is brought pursuant to a statutory provision, in Abbamont the CEPA, that the entity may be subject to punitive damages despite the general prohibition of this subsection of the TCA. 138 N.J. at 426-34, 650 A.2d 958; accord Green v. Jersey City Bd. of Educ., 177 N.J. 434, 446-47, 828 A.2d 883 (2003) 437-38 (2003) (applying punitive damage liability against public entity under CEPA); see also Lockley v. Dep't of Corrs., 177 N.J. 413, 421-22, 828 A.2d 869 (2003) (applying punitive damage liability against public entity under LAD); Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 132-34, 735 A.2d 548 (1999) (same); cf. Ramapo Brae Condo. Ass'n, Inc. v. Bergen County Hous. Auth., 328 N.J.Super. 561, 575-76, 746 A.2d 519 (App.Div.2000), aff'd o.b. 167 N.J. 155, 770 A.2d 253 (2001) (declining to apply punitive damage liability against public entity under the Consumer Fraud Act (CFA), based upon the policy underpinnings of the CFA).
We are thus satisfied that punitive damages are available against the County defendants with respect to the statutory claims under the CSAA. The considerations that informed the Supreme Court's analysis for permitting an award of punitive damages in Abbamont, under CEPA, apply equally to plaintiff's statutory based claims under the CSAA against the County defendants predicated on vicarious liability for the intentional acts of child abuse by Mason. The public policy consideration for imposing punitive damages is the vulnerability of children in the County Detention Center's care and the non-delegable duty of its supervisors to protect them from victimization. Hardwicke, supra, 188 N.J. at 76, 902 A.2d 900; see also Scott-Neal v. N.J. State Dep't of Corrs., 366 N.J.Super. 570, 577, 841 A.2d 957 (App. Div.2004); Marion v. Borough of Manasquan, 231 N.J.Super. 320, 323, 555 A.2d 699 (App.Div.1989).

III.
We now examine N.J.S.A. 59:9-2 to see if that provision's "limitation on judgment" bars plaintiff's common-law claims for negligence and the intentional infliction of emotional distress against the County defendants. We are satisfied based on its express language that N.J.S.A. 59:9-2 bars an award of damages against the County defendants on their common-law claims. DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005) ("[w]e ascribe to the statutory words their ordinary meaning and significance").
N.J.S.A. 59:9-2(d) provides:
"No damages shall be awarded against a public entity . . . for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function . . . where the medical treatment expenses are in excess of $3,600.00. For purposes of this section medical treatment expenses are *1235 defined as the reasonable value of services rendered for necessary . . . medical . . . treatment of the claimant for such injury. . . . "
Thus, N.J.S.A. 59:9-2(d) contains a threshold expense qualification for the recovery of damages for pain and suffering against a public entity. In order to recover damages for pain and suffering, plaintiff must suffer a permanent injury and his medical expenses must exceed the monetary threshold of $3600. See Lascurain v. City of Newark, 349 N.J.Super. 251, 793 A.2d 731 (App.Div.2002); Thorpe v. Cohen, 258 N.J.Super. 523, 527-28, 610 A.2d 878 (App.Div.1992).
The 1972 Task Force Comment to N.J.S.A. 59:9-2(d) states:
[T]he limitations on recovery of damages in subparagraph (d) reflects the policy judgment that in view of the economic burdens presently facing public entities a claimant should not be reimbursed for non-objective types of damages, such as pain and suffering, except in aggravated circumstances  cases involving permanent loss of a bodily function . . . where the medical treatment expenses are in excess of $1,000.00.[4] The limitation that pain and suffering may only be awarded when medical expenses exceeds $1000 insures that such damages will not be awarded unless the loss is substantial.
The medical expenses provided to the court, at the time of the County defendants' summary judgment motion in the amount of $1300, were clearly below the TCA monetary threshold. Therefore, the motion court correctly held that plaintiff failed to meet the TCA's monetary threshold.
Plaintiff contends, however, that because Dr. Rubin in his January 11, 2005 report opined that plaintiff's emotional distress is permanent and in a certification dated January 2, 2006 projected future treatment costs for plaintiff in excess of $30,000, the court erred in granting summary judgment on his common-law claims. In our view, Dr. Rubin's opinion with respect to the permanency of plaintiff's emotional injury based on the acts perpetrated on him at the Detention Center is speculative. Dr. Rubin's opinion, in light of the conclusions expressed by him in his January 2005 report, does not differentiate the emotional distress caused by the events at the detention center from plaintiff's preexisting personality disorder. Dr. Rubin provides no reasons for his conclusion that plaintiff's emotional distress from his sexual abuse by Monet is permanent. Therefore, as to permanency and projected future treatment costs, Dr. Rubin's opinion, in our view, constitutes a net opinion. See Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981) (stating "[t]he `net opinion' rule [is] . . . that an expert's bare conclusions, unsupported factual evidence is inadmissible.").
Consequently, there is no competent evidence in the record establishing that plaintiff has suffered a permanent injury or that he will reach the monetary threshold of $3600 as a result of future treatment. Therefore, we conclude plaintiff's common-law claims are barred by the TCA. See Rocco v. N.J. Transit Rail Operations, Inc., 330 N.J.Super. 320, 749 A.2d 868 (App.Div.2000) (where a psychiatrist's report was held to have failed to disclose an opinion that plaintiff is suffering from substantial permanent psychological injury so as to qualify as a permanent loss of a bodily function); Lascurain, supra, 349 N.J.Super. at 281-82, 793 A.2d 731 (finding *1236 that an intentional infliction of emotional distress claim must meet the monetary threshold).

IV.
We hold that the Detention Center qualifies as a "person standing in loco parentis within the household" as to plaintiff within the meaning of the CSAA and that the County defendants are not immune under the TCA, based on modern agency principles, from liability for compensatory and punitive damages under the passive abuser liability provision of the CSAA.
We conclude based on the factual allegations recited herein that a rational factfinder could find, accepting plaintiff's allegations in the light most favorable to him, that supervisory personnel at the Detention Center knowingly permitted or acquiesced in the sexual abuse of plaintiff by Mason, as a result of which he suffered compensatory damages as defined in the CSAA. Brill, supra, 142 N.J. at 535-36, 666 A.2d 146. Additionally, plaintiff is entitled to seek punitive damages under the CSAA.
Accordingly, we reverse the court's grant of summary judgment on plaintiff's complaint for compensatory and punitive damages under the CSAA contained in count one of plaintiff's complaint and remand count one to the Law Division for trial. For the reasons stated in this opinion, we affirm the motion court's grant of summary judgment on the common-law claims contained in counts two, three and four of plaintiff's complaint.
Affirmed in part; reversed and remanded in part.
NOTES
[1] On June 30, 2006, plaintiff voluntarily dismissed his complaint as to Monet Mason in order to allow this appeal to proceed as an appeal from a final judgment.
[2] The Detention Center is also referred to in the pleadings, record and exhibits as the Mercer County Youth House.
[3] The Detention Center and Mercer County will be referred to in this opinion as County defendants.
[4] This subsection was amended by L. 2000, c. 126, § 32 to increase the dollar threshold to $3600 from $1000.